Moss, Judge,
delivered the opinion of the court:
The plaintiff, Arrowhead Springs Company, owned and operated the Arrowhead Springs Hotel at San Bernardino, California. On February 23, 1920, plaintiff leased to the Government its entire property consisting of buildings, machinery, and equipment, including 1,800 acres of land situated in the Angeles Forest Beservation, at the rate of $62,500 per annum, payable in monthly installments of $5,208.33. The property was leased to the Government for use as a hospital, and was under the control of the United States Veterans’ Bureau. The lease was renewable from year to year at the option of the Government. It contained the following provision: “ That the United States will not suffer or permit any damage to the premises, buildings, fixtures, or furnishings; and that upon the termination of this *229 occupancy, the United States shall replace all of said property in the same shape and condition as at the time the Government took possession thereof, ordinary wear and tear, and damage by fire, or other casualty excepted.”
The Government remained in the occupancy of said property for a period of more than four years, to wit, until September, 1924.
It is conceded by defendant that during the occupancy of the leased property herein many changes were made in the property; and that the buildings, grounds, furniture, fixtures, and equipment of the hotel property were greatly damaged beyond ordinary wear and tear. At the termination of its occupancy the Government refused to restore the property, and negotiated with plaintiff for a settlement of the damages to said property, failing in which, plaintiff undertook to and did restore same. Plaintiff’s claim as set forth in its petition amounted to $97,766.54 for the buildings and grounds and $27,730.41 for restoring- and repairing furniture and fixtures, making a total of $125,479.95. There is an undisputed claim- of $10,759.12 for rent for the holdover period, and a further claim for damage by fire, which will be separately considered.
The main hotel building was erected in 1904 — 5 at an initial cost of $115,000. The sum of $20,000 was thereafter expended in improvements on the building. It is a frame building with stucco exterior, the lower part being of stone rubble.
The hotel was operated as a tourist and health resort, and appealed to a very high-class patronage. It was equipped to care for as many as 135 guests, and 300 persons could be served at one time in the dining room. There were bathhouses for both men and women, suitable dressing rooms, rest rooms, massage rooms, and a Turkish-bath department. There were, also, natural-steam bathhouses not far distant from the main building; and surrounding one of the group of hot springs was a deposit of mineralized mud known as a mud ciénega. There was a laundry, an ice plant, and a sewage-disposal plant. The gardens and grounds, consisting of about 120 acres immediately surrounding the hotel, were *230 planted with shrubs and shade and fruit trees, and at the time the Government took possession the grounds were in excellent condition, and the shrubs and trees were well cultivated, and properly irrigated. (Finding VII.) When the Government returned the property to plaintiff the hardwood floors in the lobby had been injured by burns and scratches to such extent that the entire floor had to be scraped down and sandpapered. The walls in the lobby, as well as the pillars, had been badly marred and scratched. The ceiling was discolored, due to leakage from the pipes above. The plastering had dropped here and there leaving the laths exposed in spots ranging in diameter from six inches to ten or twelve feet. Some of the pillars, both in the lobby and in the dining room, had been whittled, and initials had been cut into them. Much of the hotel furniture had been broken and defaced, and some of it had been lost. Rugs had been burned, some of them to such extent that they had to be entirely discarded. The women’s bathhouse had been dismantled and converted into a warehouse. The mud ciénega was filled with gravel, sand, lead and iron pipes, and debris of various kinds, which resulted in its complete destruction for the purpose for which it was intended. The laundry building had been torn down and dismantled. Some of its equipment had been lost, and some of it had been stored in a shed, and greatly injured by exposure to the weather. The Government had constructed and equipped a new and a larger laundry building, which had been dismantled, and the equipment sold and removed prior to the evacuation of the property by the Government. One side of this new laundry building was torn out and the plumbing connections were destroyed. The ice plant left by plaintiff had been removed and another installed by the Government, which, at the time of the return of the property, was inoperative. The trees and shrubbery were greatly damaged through lack of care and proper irrigation. One of the orchards had been used for pigpens, and approximately 40 fruit trees had been destroyed. The septic tank used by the hotel had been filled with dirt, and abandoned, and the Government had constructed two tanks placed above *231 the ground. They were insanitary-and ineffective, and had "to be removed. In order to convert the hotel into a hospital the Government found ft necessary to make changes in the plumbing system. Some of plaintiff’s plumbing fixtures were removed and lost, and the fixtures installed by the Government were removed at the termination of its occupancy. The switchboard connection for telephone service to the various rooms, and the telephone instruments had been removed and stored, or lost. The wiring had been changed and many of the electrical fixtures and connections had disappeared. The plaintiff found it necessary to remove much of the- plumbing and wiring of the hotel. A lath house, barn, and' a four-room bungalow were destroyed. This is a very brief recital of conditions existing at the time the Government acquired the property and at the time it returned same, as found by the commissioner. No exceptions have been presented by the Government to his finding. (Finding VIII.)
Plaintiff actually expended $97,746.54 on the buildings and grounds, and $27,730.41 on account of furniture and fixtures. Its right of recovery, however, is limited to such sum as would be necessary to -replace said property in the same shape and condition as ai the time when the Government took possession, and the ascertainment of that sum, in this case, is a matter of extreme difficulty, for it is obvious, we think, from an examination of the record that much of plaintiff’s expenditures were for the betterment and improvement of the property. In this connection, it should be noted that during the negotiations for a settlement of plaintiff’s claim both plaintiff and the United States Veterans’ Bureau separately examined the property and made estimates of the probable cost of its replacement and restoration, and there resulted a settlement agreement between plaintiff and defendant covering all damage, except for the cost of the restoration of the furnishings, which provided for the payment to plaintiff of the sum of $24,638.25, from which there was to-be deducted the sum of $5,000 for certain bungalows which the Government constructed and left upon the premises. Payment under said settlement agreement was refused *232 by the Comptroller General, and this suit resulted. If there should be added to the $24,638.25 the full amount of the cost of restoring and repairing furniture and fixtures as claimed by plaintiff in its brief, $12,617.25, the total amount would be only $37,255.50. While the settlement agreement is not in any sense binding upon plaintiff, the court can not disregard the importance of that transaction as to an item for which plaintiff now claims in its petition the sum of $97,746.54. It should further be observed that while plaintiff sued for the recovery of $97,746.54 for buildings and grounds, and $27,730.41 for restoring and repairing furniture and fixtures, it is asking in its brief for only $53,303.73 for buildings and grounds, and $12,617.25 for restoring and repairing furniture and fixtures. These matters are mentioned only as exemplifying the manifest uncertainty of plaintiff’s Judgment as to the amount properly chargeable to mere restoration and replacement.
The commissioner has found the cost of restoring the buildings and grounds to be $29,382.66, and the cost of re-storing the furniture and fixtures to be $9,584.38. He held the hearings in the case on the premises, with the advantage-that is afforded by personal contact with witnesses, and by a personal inspection of the particular items of property which are the subject of controversy, and his opinion is,, therefore, entitled to great weight. We believe, however,, that the evidence justifies a larger allowance for the cost of restoring furniture and fixtures than was fixed by the commissioner. We have determined this amount to be $11,584.38; and we adopt the finding of the commissioner, $29,382.66, as to the cost of restoring the buildings and grounds. In reaching this conclusion as to the buildings and grounds we have taken into consideration the value of the bungalows constructed by the Government and left on the premises.
The facts concerning the fire for which plaintiff claims damages are set forth in Finding XIII.
Plaintiff’s claim under this item is based upon the sole allegation in the petition, “A forest fire was started by the inmates of the hospital while it was occupied by the United States and greatly damaged the premises.” In its brief plaintiff states that—
*233 correctly states the contention of the claimant that the defendant is responsible for the fire loss >on two grounds:
“(1) The fire loss was caused by the negligence of the methods of the hospital and is not excepted in the lease.
“(2) In any event the loss resulted from the negligence •of the defendant in supplying, operating, and maintaining ¡defective fire hose.”
It will be recalled that the Government obligated itself to “ replace all of said property in the same shape and condition as at the time the Government took possession thereof, •ordinary wear and tear and damage by fire or other casualty excepted: * * (Our italics.) In discussing this question, and in citing authorities in support of its contention, plaintiff seems to have assumed that the terms “ fire or •other casualty,” were intended to be used interchangeably. Clearly, they were not so intended. The words “ fire ” or “ other casualty ” relate to separate or distinguishable causes which might result in damage to the property. The language will bear no other reasonable interpretation. The damage in this case was caused by “ fire,” and we must determine whether or not defendant is liable under the contract for such damage.
The Government may not be held responsible in damages in this case except on the ground of negligence. Negligence is the want of ordinary care, and ordinary care is .such care as an ordinarily prudent person would be expected to exercise, in like circumstances, where his own interests were involved. Applying this rule in the present case, What were the duties of the Government concerning protection from fire? The fire originated at a spot frequented and resorted to for gambling purposes by the hospital patients. The place was about five or six hundred feet from the garage, which adjoined the hotel building, and was in a dense growth of brush and timber, and was thereby quite “ completely isolated.’’ (Finding XIII.) It is shown in the record that the patients had been accustomed to hide out on the premises for the purpose of gambling, and that the practice had been forbidden by the authorities who had watched diligently with the view of discovering them. The commanding officer made frequent trips over the premises for that pur *234 pose, sometimes as often as twice a day. These patients were in no sense agents or employees of the Government. They were sick or convalescent soldiers, and even if it be assumed that the fire was caused by their negligent act, the Government would not be responsible for the damage resulting-therefrom. And furthermore, the Government’s position on this point is strengthened by the fact that it not only did not permit this practice by the patients, but used every reasonable effort to prevent it. The patients were not only admonished on the subject, but diligent and constant efforts were made to discover them while engaged in the forbidden practice. It was an exercise of more than ordinary care.
The plaintiff contends, however, that the Government was negligent in “ supplying, operating, and maintaining defective fire hose.” The fire broke out at a point some five or six hundred feet from the garage. Immediately upon the discovery of the fire the Government employees connected and ran out some four hundred or five hundred feet of hose from the fire truck which was located in the garage. This line of hose extended near enough to the fire for a stream of water to reach the fire. A coupling broke, or became disconnected, and a section of hose was supplied from a hose reel near at hand, which had been exposed to the weather, and the hose was not in good condition, and this extra hose broke under the pressure of the water. There was a high wind, and the fire was soon beyond control. It must be borne in mind that this fire did not occur in or about the hotel proper, or any of the surrounding buildings, but had its origin in the open, and on premises which contained 1,800 acres of land. The plain meaning of plaintiff’s contention stated affirmatively is, that the Government negligently failed to supply suitable fire hose for the protection of the outlying area. The offending patients did not limit their activities to points within reach of fire hose, which had to be attached to the hydrant at the main building. They operated at other points more remote from the buildings and beyond the reach of any fire hose, whether sound or defective. Obviously, the fire hose was only intended for the protection of the buildings, and it is not shown that it was *235 purpose. were ten or twelve lengths or about two thousand feet of hose on the fire truck. It was the extra hose which burst under pressure of the water. Certainly the disconnection of the coupling in the line of hose extending from the fire truck could not be charged as negligence on the part of the Government. However that may be, we have reached the conclusion that the Government was under no obligation to maintain fire hose for the protection of the outlying premises from fire. "
" The Government is not liable for the damage resulting from the fire. For cases in point see: Smith v. Andrews, 152 La. 783, and American Grecian Turpentine Co. v. Harper, 29 Ga. A. 101.
Plaintiff is entitled to recover the sum of $51,726.16.
Sinnott, Judge; Green, Judge; Graham, Judge; and Booth, Chief Justice, concur.